IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 12, 2020 Session

## ROBERT G. THORNTON, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Hickman County**
**Nos. 14-023CR, 18-CV-7       James G. Martin, III, Judge**

_____

### No. M2019-01259-CCA-R3-PC

_____

In 2014, a Hickman County jury convicted the Petitioner, Robert G. Thornton, Jr., of two counts of rape, and the trial court merged his convictions and sentenced him to twelve years of incarceration.  The Petitioner appealed his convictions to this court, and we affirmed the judgments.  *State v. Robert G. Thornton, Jr.*, No. M2015-01895-CCA-R3-CD, 2017 WL 2704123 (Tenn. Crim. App., at Nashville, June 22, 2017), *no perm. app. filed*.  The Petitioner then filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel, which the post-conviction court denied after a hearing.  We affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

M. Stuart Saylor, Franklin, Tennessee, for the appellant, Robert G. Thornton, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Jennifer M. Mason, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts and Background

This case originates from the Petitioner's rape of the minor victim in the Petitioner's home.  Based on these events, a Hickman County grand jury indicted the Petitioner for two counts of rape.

### A. Trial

The following is a truncated version of this court's summary on appeal of the facts presented at trial:

Tina Thigpen is the Principal at the Hickman County Middle School. During the 2012-2013 school year she was employed as a guidance counselor at the school. On May 2, 2013, Ms. Thigpen was requested to speak with the victim after there had been a fight during recess that day. The victim did not participate in the fight although he was the "subject" of the fight. Ms. Thigpen called the victim into her office, and they had a conversation. The victim was concerned that he had an STD, which raised many "red flags" with Ms. Thigpen. She continued speaking with the victim and suggested that he be tested. The victim became "visibly shaken, scared, upset," and he began crying. Ms. Thigpen testified that she felt the need to notify the school principal, the victim's mother, and law enforcement. The victim's mother and law enforcement later arrived at the school.

The victim's mother testified that she has three sons. At the time of the offenses, the victim was fourteen years old and in the eighth grade. The victim's mother testified that he liked sports and music, and she described him as a quiet child who was "sweet and kind."

On May 2, 2013, the victim's mother received a call from Ms. Thigpen at the Hickman County Middle School. The victim's mother then left work and drove to the school. She walked into the room where the victim was sitting, and she immediately noticed that he was very upset. She knew that there was "something drastically wrong with him." The victim's mother noted that the victim spent nearly every weekend with his father, from whom the victim's mother had been divorced since 2000. She had noticed changes in the victim in the weeks leading up to May 2, 2013. The victim's mother described him as "more distan[t] than ever," and he spent a lot of time in bed. She also testified that the victim constantly wore a hoodie, and he was "very sick all of the time."

The victim testified that he met [the Petitioner] during the victim's eighth grade year at school. He said that he went to [the Petitioner's] house with a friend, J.D., for a birthday party. The victim testified that there was alcohol at the party, and everyone was drinking except for [the Petitioner]. The victim said that he drank "two shots." He and J.D. then spent the night at [the Petitioner's] house. After that, the victim testified that he and J.D. visited [the Petitioner's] house every other week for a "month or a month

2

and a half." The victim testified that [the Petitioner] had a television but he did not have cable. [The Petitioner] also usually had alcohol for them to drink. The victim testified that he and J.D. usually talked and hung out together while at [the Petitioner's] house. He said that [the Petitioner] also had a roommate but the victim only saw him one time. The victim also saw other people at [the Petitioner's] house who were older than the victim. He said that there were no rules at [the Petitioner's] house. The victim testified that the main reason he went to [the Petitioner's] house was to "hang out" with J.D. He said that [the Petitioner] was always there and sitting "in front of his couch or on the chair."

The victim described his relationship with [the Petitioner] as someone he could talk to and "open up to for problems." The victim testified that J.D. and [the Petitioner] were at [the Petitioner's] house the last time that the victim was there. He said that he and J.D. were "messing around being stupid," and [the Petitioner] had rum and Mountain Dew at the house. [The Petitioner] mixed the two ingredients together and gave it to the victim. The victim thought that J.D. also had a drink. The victim testified that he drank two cups of the mixture and began to feel lightheaded and off balance. He said, "Like whenever I was turning or tried to move my eyes everything felt like it was going like in slow motion and moving all together I guess." The victim testified that he had never drank that much or felt that way before.

The victim testified that [the Petitioner] showed the victim and J.D. some pornography that was playing on the television, and the victim and J.D. then went to the back room of the house and talked. The victim described the room as the closest one to the living room. He said that [the Petitioner] walked into the room while the victim and J.D. were on the bed talking. The victim testified that [the Petitioner] asked him if he wanted to "try anal or anything with a guy," and the victim told him, "I didn't want to." The victim said that the next thing he remembered was being facedown and feeling a sharp pain inside his "butt." He could not turn around to see what was inside of him but he felt a "ripping" sensation. The victim testified that he felt J.D.'s hand on his back, and J.D. told [the Petitioner] to stop because he was hurting the victim. The victim said that he could not tell [the Petitioner] to stop because he was in too much pain. He testified that the pain stopped after a while, and he "just kind of laid there," and J.D. hugged him. The victim testified that J.D. was in the room the entire time that [the Petitioner] was raping him. He said that [the Petitioner] did not say anything and left the room after the rape. The victim

3

went to sleep, and [the Petitioner] was gone when he woke up at approximately 7:30 to 8:00 a.m. the next morning. The victim left [the Petitioner]'s house and walked to his girlfriend's house. The victim did not tell anyone what happened because he was scared and wanted to forget about it.

The victim admitted that he spoke with a detective a few weeks before he told Ms. Thigpen what happened. He did not tell the detective about the rape because he did not want to talk about it, and he wanted to "leave it alone and forget about it." The victim said that he finally told Ms. Thigpen what happened because he trusted her, and [the Petitioner] was in jail and "already caught." The victim testified that it was difficult to tell his mother what happened, and he did not want anyone to "feel bad" for him.

On cross-examination, the victim testified that [the Petitioner] never personally invited the victim to his house, and he did not pressure the victim to drink alcohol or watch pornography on television. The victim admitted that he asked for alcohol the last time that he was at [the Petitioner]'s house. He recalled talking to a woman a few weeks after he disclosed the rape. The victim told the woman that he went to [the Petitioner]'s house three times, and [the Petitioner] was at the house one of those times. He did not feel comfortable telling the woman the whole truth and everything that went on. He said that he was afraid to tell her how many times he went to [the Petitioner]'s house and what he was doing there.

The victim testified that he was wearing tight stretchy pants at the time of the rape. He described them as "like the ones you probably get from like Hot Topic or kind of store like that." He also usually wore "band shirts." The victim did not recall how his pants were removed, and he said that [the Petitioner] pushed him from the shoulder, and he was face down on the bed. He did not know how long the rape lasted, and he could not do anything to stop it. The victim testified: "I was like I blacked out once my face hit the bed. I couldn't—I wasn't—I was kind of shocked at the moment. I didn't know what was going on and I felt a sharp pain."

The victim said that he could not "really move," and it "hurt real bad." He felt as though he "couldn't do anything about it." The victim testified that he felt a hand on his back, and he knew that it was J.D.'s hand "because it felt gentle [.]" He heard J.D. yelling "stop you're hurting him." The victim again testified that J.D. hugged him, and the victim went to

4

sleep. He did not recall telling the woman during the interview that he went into the living room after the rape and slept on the couch with J.D. The victim also did not recall telling the woman during the interview that [the Petitioner] used baby oil from the nightstand and that the rape lasted approximately fifteen to thirty minutes.

The victim did not recall every time that he went to [the Petitioner]'s house but he said that [the Petitioner] was there. However, [the Petitioner] would sometimes leave after the victim got there. He did not recall telling Officer Mobley that he had been to [the Petitioner]'s house four times, that [the Petitioner] was not there the first two times, and that [the Petitioner] was only there for fifteen minutes the third time the victim was there. The victim testified that he spent the night at [the Petitioner]'s house two times. On redirect examination, the victim testified that he never returned to [the Petitioner]'s house after the rape. He estimated that he had been to [the Petitioner]'s house four or five times.

. . . .

J.D. testified that he currently lives in Hendersonville, Tennessee with his mother and is enrolled in an online school. He previously lived with his father in Hampshire, Tennessee, located "technically" in Maury County but he had attended Hickman County Middle School. He was friends with D.W. who introduced him to [the Petitioner]. J.D. testified that D.W. referred to [the Petitioner] as his "uncle." They stopped by [the Petitioner]'s house one night on Halloween and stayed approximately fifteen to thirty minutes. After that, J.D. testified that he visited [the Petitioner]'s house "maybe every other weekend." J.D. said that M.C. and the victim would come over to [the Petitioner]'s house. J.D. had known the victim since they were both in seventh grade. J.D. thought that the victim went to [the Petitioner]'s house with J.D. two or three times. He said: "Sometimes we would just sit there and listen to music. Sometimes there would be drinking involved, but I would just mainly be hanging out with my friend, you know, we would just do typical stuff, talk so—[.]" J.D. testified that [the Petitioner] sometimes had Vodka at the house, and one time there was rum or Jagermeister.

J.D. testified that he spent the night at [the Petitioner]'s house [m]ost of the times that [he] went over there." The victim was not with him every time that he stayed at [the Petitioner]'s house. J.D. testified that his memory of the night of the offense was a "little fuzzy." However, he

5

distinctly remembered the victim "on the bed and I remember [the victim] was in pain and I was telling [the Petitioner] to stop." He also told [the Petitioner] that he was hurting the victim. J.D. specifically testified that [the Petitioner] was penetrating the victim's anus with [the Petitioner]'s penis. J.D. testified that he could tell from the victim's facial expression that he was in pain. He did not recall if the victim said anything. J.D. testified that he was on the bed next to the victim when the rape occurred. He did not recall how the victim's pants were removed, and he said that [the Petitioner] was wearing pants but that they were unzipped and pulled slightly down. J.D. testified that the rape lasted approximately fifteen minutes, and he "felt powerless." He thought that he hugged the victim after the rape, and they both went to sleep.

J.D. testified that he could not remember everything that happened because "[w]e were inebriated." J.D. thought that he had been drinking Vodka and that he had more to drink than the victim. He believed that the victim went to [the Petitioner]'s house with him one time after the rape occurred.

On cross-examination, J.D. testified that [the Petitioner] never forced him to drink alcohol. He said that [the Petitioner] was at the house every time that J.D. was there with the victim. J.D. did not believe that anyone other than he and the victim was at [the Petitioner]'s house on the night of the rape. J.D. testified that he and the victim were lying on the bed with their head on the head board and their feet vertically on the bed. He said that they were not lying on the edge of the bed. J.D. thought that he and the victim had been in the bedroom talking for approximately thirty to forty-five minutes when [the Petitioner] walked into the room. J.D. testified that he did not call anyone to help stop the rape because he was afraid. The first time that he told anyone what happened was when his principal asked him about it.

Sergeant Levy Mobley of the Hickman County Sheriff's Office testified that he was working as a detective for the sheriff's office in the spring of 2013. He received information during that time that teenage boys were "hanging out" at [the Petitioner]'s residence.

Sergeant Mobley interviewed the victim on April 19, 2013, at the victim's home. The victim's mother was present, and Detective Mobley asked the victim about what went on at [the Petitioner]'s house. Detective Mobley testified that the victim was "reserved," and he would not give

6

Detective Mobley much information. The victim admitted to being at [the Petitioner]'s house and that he and other friends drank alcohol and watched pornographic movies while there. He told Detective Mobley that he had been to [the Petitioner]'s house three to four times. According to Detective Mobley's notes, the victim said that [the Petitioner] was not at the house the first two times that the victim was there. The victim also said that [the Petitioner] was there for approximately fifteen minutes the third time, and [the Petitioner] was there the fourth time for the entire time the victim was at the house. The victim did not tell Detective Mobley anything about what happened to him personally at [the Petitioner]'s house. Detective Mobley did not press the victim on the issue because it made Detective Mobley "a little bit uncomfortable." When asked why it made him uncomfortable, Detective Mobley testified: "Well, because he's a child and because of the allegations that I was aware of that been [sic] going on over there, I was a little uncomfortable with it."

Detective Mobley also talked with [the Petitioner] about what may or may not have been going on at his house. He testified:

> [the Petitioner] advised me that the boys, you know, they would come over sometimes. He—he had a son named [D.W.] that I guess they were supposedly friends and that's— that was the connection, but anyway they—he had—he let boys come over and they stay around his house.

[The Petitioner] told Detective Mobley that he would allow the boys to drink "Fanta" and watch movies. [The Petitioner] also told him that he would talk to the boys about their problems at school and "stuff like that." Detective Mobley testified that [the Petitioner] denied allowing the boys to watch pornography, and he said that they only watched cartoons. [The Petitioner] told Detective Mobley that he kept alcohol in the refrigerator but that he never provided any to the boys.

On May 2, 2013, Detective Mobley was called to the Hickman County Middle School by the Principal. He spoke with J.D. and the victim, who was visibly upset and crying. Detective Mobley asked the victim specific and detailed questions, and their conversation lasted fifteen to twenty minutes. He said that the victim's demeanor was different than their first conversation on April 19, 2013. He also noted that victims of "sexual crimes don't always admit to it at first." Detective Mobley then referred the victim to the Child Advocacy Center to be interviewed. Detective

7

Mobley also interviewed M.C. and D.W. Detective Mobley testified that the victim told him at the school that he had been to [the Petitioner]'s house more than twice. He admitted that there were some small inconsistencies between what the victim told him on April 19, 2013, and what the victim told him on May 2, 2013, about how many times he was at [the Petitioner]'s house. When asked if the inconsistencies concerned him, Detective Mobley testified:

> Well, I mean it didn't really concern me because like I said before, it didn't surprise me on the first interview the fact that he didn't reveal anything, didn't—because I'm sure he was ashamed and probably was a little embarrassed and didn't want to—you know, I kind of took him by surprise because they had no idea why I was there . . .

*Thornton*, 2017 WL 2704123, at *1-7. The trial court merged the two rape convictions and imposed a twelve-year sentence with service at 100%. *Id.*

## B. Post-Conviction Proceedings

The Petitioner filed a *pro se* petition for post-conviction relief, which was later amended by appointed counsel, alleging that he had received the ineffective assistance of counsel. He contended, relevant to this appeal, that trial counsel ("Counsel") was ineffective when he "conceded" at trial that a rape had occurred during his cross-examination of the victim.

The following evidence was presented at a hearing on the petition: The Petitioner testified that he was not guilty of touching the victim sexually in any way, or of raping him, and that Counsel's cross-examination of the victim at trial did not aid in establishing his innocence. For example, during his cross-examination of the victim, Counsel acknowledged that the victim's testimony would be "uncomfortable" and "painful;" the Petitioner disputed this characterization because he planned to testify that he never touched the victim. Counsel also asked the victim to "set the scene" of the rape for the jury, a question which the Petitioner said made him appear guilty. The Petitioner testified that this question was devastating to his trial. Counsel also asked the victim about him taking his pants off during the rape which, again, the Petitioner stated made him look guilty.

The Petitioner testified that during Counsel's cross-examination of the victim, Counsel asked the victim if the Petitioner put the victim face down while the Petitioner attempted to rape him. The Petitioner testified that, in pre-trial discussions, he never

gave Counsel permission to state that there had been an attempted rape, or that the victim's pants had come off, or that the Petitioner might plead guilty to a lesser-included offense. The Petitioner said that these statements in front of the jury were very harmful to his case. He also took issue with Counsel's failure to pose an alternate theory about why the victim and his friend were testifying that the Petitioner had raped the victim. Prior to trial, the Petitioner had raised with Counsel several theories, including coercion by the guidance counselor or a possible girlfriend shared by the boys.

On cross-examination, the Petitioner testified that the possible motive for the guidance counselor or law enforcement coercing the victim into accusing him of rape was because the Petitioner was homosexual. He agreed that he wanted Counsel to present to the jury that law enforcement, specifically a man identified as Detective Garland, wanted to put him in jail because of his sexuality and then somehow got the victim and the guidance counselor to go along with it. The Petitioner could not provide any names of witnesses who would further his alternate theory. He stated that the victim's therapist should have been called as a witness because maybe the victim had lied. The Petitioner agreed that his main theory was that the victim and J.D. had lied at his trial.

The Petitioner agreed that the victim and the victim's mother were emotional during their trial testimony but he felt Counsel should have attacked their testimony and been a lot more aggressive. Counsel told the Petitioner that he had to go easy on the victim so as not to anger the jury. The Petitioner testified that, in his opening statement, Counsel should have taken the opportunity to present that "this could have happened" or "this might have happened," meaning alternative theories of events.

Counsel testified that he represented the Petitioner at trial, and the Petitioner always maintained that he was innocent of the rape allegations. As such, Counsel never discussed using the theory of consensual sexual contact at trial. The Petitioner did mention to Counsel a conspiracy theory between the victim, J.D., and the police officers because the Petitioner was homosexual; Counsel did not find any evidence of this and did not present it to the jury. Counsel met with the Petitioner between ten and fifteen times prior to trial.

Counsel agreed that the Petitioner was indicted on twenty-one counts, and he entered *nolo contendre* pleas to some of the offenses, including one for sexual battery. To other counts, he pleaded guilty, reserving a certified question of law. Still other counts were dismissed. The Petitioner's case went to trial on two of the indicted counts, both for rape. Counsel filed a pre-trial motion to sever the twenty-one-count indictment because a portion of the charges were for nude photos of male minors contained on the Petitioner's computer, which would have severely damaged the Petitioner in the rape trial. Another minor victim was named in the indictment as well, and Counsel sought to

9

have the charges with respect to the other minor severed. Counsel stated that the Petitioner had been arrested for solicitation of a minor in a separate case and the arresting officer, Detective Garland, was part of the Petitioner's conspiracy theory. As such, proving the Petitioner's theory would have put the solicitation of a minor charge into evidence by way of Detective Garland's testimony. The Petitioner did not provide Counsel with any other "alternate" theories in support of his innocence.

Counsel's theory was that the rape was fabricated, and the Petitioner testified it did not happen. Counsel presented the victim's inconsistencies, including descriptions of the setting of the rapes. He also questioned the victim about why he did not call the police when the rape happened. Counsel explained that his use of the word "rape" was in response to the victim using the term in his testimony; Counsel was simply questioning the victim about it while maintaining throughout the trial that the rape did not happen. The Petitioner and Counsel felt "good" after Counsel's closing argument, and the Petitioner did not express dissatisfaction with Counsel's language or message.

Regarding his cross-examination of the victim, Counsel testified he was not aggressive or a jerk to the victim because the State had portrayed the victim as very innocent and the jury would not have liked him attacking the victim. He testified that being more aggressive with the victim or the victim's mother would not have helped the Petitioner's case.

On cross-examination, Counsel testified that, regarding plea negotiations with the State, he advised the Petitioner to reject the State's offer because accepting the offer meant admitting guilt, which the Petitioner steadfastly denied. Counsel agreed that he could have zealously cross-examined the victim without being aggressive. When shown a transcript of the victim's trial testimony, Counsel agreed that the victim did not use the term "rape" during his testimony as Counsel had previously stated. Counsel agreed that he said to the victim, "Let's set the scene of this rape," stating that the victim had already described the Petitioner's house on direct examination and Counsel wanted to point out inconsistencies in the victim's testimony.

As relevant to the Petitioner's issues on appeal, the post-conviction court's order states:

> The Court finds that [Counsel] did not concede [the Petitioner's] guilt. During the post-conviction hearing, [the Petitioner] testified that he was very concerned by [Counsel's] use of the word "rape." . . . . [The Petitioner] did not express any displeasure at how [Counsel] handled the case. Further, [the Petitioner] did not include his grievances about [Counsel's] use of the word "rape" in his *pro se* Petition for Post-Conviction Relief. The issue was first raised in [the Petitioner's] Amended

10

Petition for Post-Conviction Relief. The Court credits [Counsel's] testimony and finds that [the Petitioner] did not express concern to [Counsel] during the trial about [Counsel's] choice of words and conduct during [the victim's] cross-examination.

[Counsel's] strategy was to show that [the victim was] lying by bringing out inconsistencies in [the victim's] and J.D.'s testimonies, such as: (1) neither [the victim] nor J.D. attempted to stop the rape; (2) that [the victim] and J.D. did not call for help even though they had cellular phones; (3) [the victim] and J.D. stayed at [the Petitioner's] home after the rape occurred; (4) [the victim] did not explain how his pants came off; and (5) J.D. returned to [the Petitioner's] house at a later date.

[Counsel] was very concerned about the jury's perception of his conduct as trial counsel. [Counsel] did not want to appear as being too "aggressive" towards [the victim] because [the victim] had "broken down" during his direct testimony. [Counsel] was afraid that if he acted too aggressively towards [the victim], he would have made [the victim] appear more sympathetic.

The record establishes that [Counsel] advocated [the Petitioner's] innocence throughout the entire trial. [Counsel's] questions were stark, but did not concede [the Petitioner's] guilt. . In *McCoy*, Mr. McCoy's trial counsel deliberately went against his client's wishes by directly telling the jury that Mr. McCoy committed the murders when Mr. McCoy pled not guilty. In contrast, [Counsel] did not go against [the Petitioner's] wishes. [The Petitioner] and [Counsel] discussed [the Petitioner's] plea of not guilty prior to trial. [Counsel] advocated [the Petitioner's] innocence in his opening statement (which occurred after the State rested). [Counsel] asked [the Petitioner] questions about whether he touched [the victim], knowing [the Petitioner] would deny that he did so. Further, [Counsel] advocated for [the Petitioner's] innocence throughout the trial. [Counsel] did not concede [the Petitioner's] guilt. [The Petitioner] is not entitled to relief on this issue.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that Counsel was ineffective in his cross-examination of the victim because Counsel conceded the Petitioner's guilt by his

improperly questioning the victim. The State responds that Counsel did not concede the Petitioner's guilt but maintained the Petitioner's innocence throughout the trial and advanced a theory consistent with that strategy. Additionally, the State contends that the Petitioner has failed to show that he was prejudiced by Counsel's decision to cross-examine the victim in the manner he did. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the

12

range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

Specifically, the Petitioner contends that Counsel "conceded" the Petitioner's guilt when he used the word "rape" when referring to one of the incidents. The Petitioner relies on *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), in support of his argument that Counsel was ineffective for "confessing" the Petitioner's guilt. He claims that Counsel's improper cross-examination of the victim effectively admitted the Petitioner's guilt. The post-conviction court disagreed, stating that Counsel had advocated for the Petitioner's

13

innocence in both his opening statement and his closing statement. The post-conviction court found that Counsel had not in any way conceded the Petitioner's guilt to the jury.

The evidence does not preponderate against the post-conviction court's finding that Counsel did not concede the Petitioner's guilt. In *McCoy*, relied on by the Petitioner, trial counsel stated in his opening statement that his client had undoubtedly committed the murders of which he was accused, in an effort to spare his client a sentence of death. 138 S. Ct. at 1505. Defendant McCoy's clear and insistent objection to his counsel telling the jury he had committed the murders was ignored by counsel. *Id.* at 1511-10. The United State Supreme Court concluded that this decision was Defendant McCoy's alone and should not have been ignored by his trial counsel, was in violation of his constitutional rights, and entitled Defendant McCoy to post-conviction relief. *Id.* at 1510-12.

We find *McCoy* distinguishable from this case. In this case, Counsel cross-examined the victim about his claim that the Petitioner sodomized him. While Counsel conceded at the post-conviction hearing that the victim did not call it a "rape," he stated that he asked the victim to "set the scene" of the incident in an effort to discredit the victim's recollection of the rape, which contained inconsistencies. This does not amount to an admission of the Petitioner's guilt. Following the State's proof, Counsel gave an opening statement in which he argued that the rape had never occurred, followed by the Petitioner testifying that the rape had never happened. Counsel closed with a similar message in his final argument. Counsel maintained the Petitioner's innocence, and, although he elected not to challenge the victim too harshly based on his strategy not to inflame the jury, he adequately advocated the Petitioner's case. Strategic or tactical decisions are given deference on appeal if the choices are informed and based upon adequate preparation. *See Goad*, 938 S.W.2d at 369; *see also Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). While Counsel's cross-examination of the victim may not have been perfect, we conclude that it fell within the wide range of "reasonable professional assistance," *Burns*, 6 S.W.3d at 462, and this court will not conclude, in hindsight, that other decisions should have been made. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the petition for post-conviction relief. We affirm the judgment of the post-conviction court.

_____

ROBERT W. WEDEMEYER, JUDGE